Our next case on the call of the docket is Agenda 11, Case 114617, Standard Mutual Insurance Company v. Norma Lay. Counsel for the appellant, please proceed. Thank you. May it please the Court, Counsel. My name is Mike Reagan. Together with David Oppenheim, seated at the Counsel's Table with me, I represent Locklear Electric, the class plaintiff in the underlying case. The appellate court, other than deciding the necessary threshold issue of whether standard was a stop to raise any defenses to coverage, decided only a single issue, never reaching any other. The appellate court erred in concluding that all Telephone Consumer Protection Act damages are, quote, in the nature of punitive damages, end quote, and therefore not insurable, quote, as a matter of Illinois law and public policy. And Justice Crook, on the panel, dissented from the denial of rehearing. I intend to devote my time this morning to that single issue. I've learned from reading this Court's opinions that it is essential to frame the question correctly and sufficiently narrowly that the correct analysis can be applied. With the great respect that I hold for the appellate court, the issue was framed incorrectly, and therefore the Court's analysis never reached the true heart of the issue. The appellate court found that TCPA damages were both, quote, penalties and, quote, punitive. The Court then concluded that such damages are uninsurable in Illinois as a matter of public policy. The Court's ruling was not dependent in the slightest way on the words of the policy. The words of the policy were not examined, policies, and for the purposes of the review of that ruling here, it must be assumed that the standard mutual policies do, in fact, extend coverage for those damages, you know, for purposes of argument. The Court said, relying on Beaver versus country mutual, that damages characterized in that manner are uninsurable by virtue of applying a largely unspecified public policy to void presumed coverage under the policy. And I respectfully submit that the appellate court did not engage in the required close reading of Beaver or of the considerable body of law on this topic elsewhere. Beaver was the first opinion and, indeed, remains the only opinion in Illinois to apply public policy to decide that the damages in such a case were uninsurable. Although we've posed for the Court's decision whether you, because this question has not been here before you, except sort of in a dicta statement in Vernier versus Burris, wish to approve the result in Beaver, but at the very least, adherence to the reasoning of Beaver shows that the appellate court below did not follow it and should be reversed. So the proper reading, and this, by the way, was a great issue to prepare for, the proper reading of Beaver shows that the issue here for decision today is whether the conduct of the insured, which gave rise to the damages in question, can be insured against. The issue here is not whether all punitive damages or penalties are insurable. That wasn't the issue in Beaver either. The defendant in Beaver was liable for punitive damages arising out of his willfully and wantonly operating a motor vehicle while he was highly intoxicated. Beaver, while a short opinion, nevertheless, was properly focused on the nature of the defendant's conduct. Beaver wrote about where to draw the line, quote, prohibiting the protection of insurance. And bear with me, please, in quoting. Beaver said, quote, it is drawn not between negligent conduct and intentional conduct, but between negligent conduct and the kind of unintentional conduct for which punitive damages may be imposed. So when Beaver talked about lack of insurance for punitive damages, that was just a proxy for saying that you cannot get the protection of insurance for, quote, the kind of conduct for which punitive damages may be imposed. Mr. Reagan? Yes, sir. And I know just from the brief opening here that this is not the basis of your argument today, yours is conduct. But I found it a little bit curious. On the issue that was addressed by the appellate court, the whole punitive damages aspect, I didn't see in their opinion, I didn't see in either yours or Mr. Chemer's brief. So this question is for Mr. Chemer's as well. What about the fact that in the same portion of the statute, again, understanding that you're thinking the appellate court rationale is completely wrong, but in the same portion of the statute there's discussion of treble damages for willful and wanton violations. Doesn't that have any impact at all as to whether or not the $500 is punitive? Yes, absolutely it does, Your Honor. And I believe, and I appreciate the court's close reading of the case, I think we do have a sentence in there perhaps to that effect saying that the availability of that, which is I think section C of the statute saying you get treble damages for willfully or knowingly violating the statute is an indication, and there is case law to that effect, saying that that's something else. That's the bad conduct for which additional damages can be levied. And it's not for decision here, but the court's hit on something, and that indicates that the other damages which may be recovered are most probably not punitive, and most probably not. Yeah, I suspected you would agree. I'm waiting for Mr. Chummer's response, but I just wanted to get that in before you get into what I think is a slightly different avenue as to your rationale. Absolutely. And there's lots that have to be left on the cutting room floor and getting ready for my 20 minutes here, and that was a key point. So Beaver relied, and most of the time we don't get into this kind of exercise, but Beaver relied on an opinion called Northwestern v. McNulty. It was written by Judge Wisdom on the Fifth Circuit, and it's a prominent landmark in this area of the law. We just haven't plucked this case out. I mean, it's really, and Beaver said that this is a prominent case, and Beaver said the court in McNulty described the nature of the misconduct. Now, I mean, it's important there. We're not talking about damages. It's not just the nature of the misconduct intended to be deterred by the imposition of punitive damages, and Beaver quoted extensively from McNulty. And McNulty and Beaver noted, quote, the general lack of agreement on the meaning of punitive damages and said that they had to explain themselves. That is, the courts had to explain themselves. And Beaver, quoting McNulty, says, First, by punitive damages we mean damages awarded with a view to punish the defendant for irresponsible conduct. Misconduct we have in mind is intentional or malicious wrongdoing or action having such a conscious disregard of others that a jury might fairly infer from the circumstances of aggravation that the wrong partakes of a criminal character. Now, the next section of the McNulty opinion, which was not directly quoted in Beaver, Beaver quoted first, second in McNulty, is that by punitive damages we do not mean such damages as may be awarded for simple negligence, even though such damages may be termed punitive. So McNulty says, look, just calling them punitive damages doesn't mean that they're uninsurable. There is a special concurrence in McNulty which seems to have anticipated the case that we have here this morning. The special concurrence in McNulty said that punitive damages is the wrong standard. It is too loose, indefinite, and uncertain. And the court went on to say it's even a chameleon of a law changing colors in all sorts of hues and situations. The concurrence said that the law of contracts is also involved, which I'll get to in a second, that parties, he quoted a very old opinion, it said men, shall have the utmost liberty of contracting. The more appropriate basis upon, this is from the concurrence, the more appropriate basis upon which to hold the public policy prohibits insurance is the nature of the conduct of the wrongdoer, not the nature of the damages awarded. If the defendant acted willfully, intentionally, maliciously, or fraudulently, coverage should be denied. And, of course, that's very consistent with the state of Illinois law. So now we look to the Illinois law of punitive damages, and we look to the TCPA to see how Beaver might be properly applied in this case. When are punitive damages awarded? We've cited the, in fact, the defendant's sites. The first history case, 2009, Gambino v. Boulevard Mortgage, and it's a useful summary. It says punitive damages will be awarded only where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference. They are only available where the wrongful act complained of is characterized by wantonness, malice, impression, or other circumstances of aggravation. In this court's other cases, a little off-center a bit, Burke v. Swell-Rothschild, Ziarco, Poole, and Murray, make it clear that even for willful and wanton misconduct, there is a wide spectrum of conduct, the only slightly worse, the negligent at one end, and the almost merely intentional at the other end. And it's only at the extreme end of that spectrum that Illinois would permit the award of punitive damages. So then we look to the conduct of the defendant. Lays conduct here, violation of the TCPA, does not begin to even remotely approach the standard that would be required under Beaver, McNulty, and the other cases around the country. Liability under the TCPA is strict. It is also completely uncontroverted in this record, and I think that's important, that Lay innocently hired a fax broadcaster who expressly represented that he had lists of places to which he could legitimately and legally fax what Lay needed and that he would comply and did comply with the law. So it can't possibly be said that the nature of the conduct of Lay here is sufficient to bring this case within the Beaver or McNulty rule. Calling the TCPA penal or the damages punitive does nothing to analyze the issue for the court. The focus must be on the conduct, and this conduct doesn't match up with the purpose or the stated scope of the rule. Mr. Reagan, we have the legal issue for sure, and that's what you've been addressing. I'd like you to comment, though, on standard, the picture that standard paints with respect to possible collusion between defendants and plaintiff's attorneys and plaintiff's class action attorneys and the people holding the bag or the insurer. That may have nothing or little, if anything, to do with any legal argument, but I think since it appears to be in this record before us, I'd like some comment on it. Sure. Well, it's a painted picture, and that's all it is. There's no evidence. The brief, with due respect to Mr. Chambers, it says that Bivens, you know, it says that we knew that there would be bad faxes here, et cetera. There's not a bit of that in the record. There could have been, but there isn't. And likewise, there is no indication of collusion. I mean, cases are settled all the time when you have a reservation of rights and where the insurer has to step back from the defense. You know, cases get settled all the time, and then there are legal standards which apply here, but there's no evidence, you know, supporting their arguments. It's just pure argument, and that's all it is. There are other ways in which the court can conclude that the Beaver Rule does not apply here, and I'll shorten this up a bit. The TCPA is a remedial statute, and it's not penal. It's an intent. And so while the insurance question before the court here is a matter of state law, the meaning and purpose of the TCPA is a federal statute, and this court said in State Bank of Cherry very recently that the weight of federal authority is something which is very persuasive with respect to the interpretation of federal courts or federal statutes. Every federal court but one district court case has decided to question that the TCPA is remedial and not penal, and the sole exception was a Colorado District case, and it was the court and it was the only case that was cited by the appellate court below. The appellate court in Italia Foods, although vacated, I clearly understand, reached a contrary opinion. We also respectfully suggest that the appellate court do not take into account another significant, strong public policy at work here, which is a public policy in honor and in favor of honoring private contracts, the freedom of contract, and also the rules applicable to the interpretation of insurance policies. The enforceability of private contract is a value which this court has always and also very recently honored. In cases such as Progressive Universal versus Liberty and most recently in late 2012 in Country Preferred versus Whitehead, the governing principles were plainly set out. It is in the public interest that persons should not be unnecessarily restricted in their private contracts. An agreement will not be invalidated unless it is clearly contrary to a plainly articulated public policy. Counselor, so I understand your point correctly. You're urging really a case-by-case or conduct-by-conduct analysis of whether the ---- Absolutely, Your Honor. So federal cases aside, it really doesn't make any difference under your theory. Is that correct or am I wrong? I've shifted grounds a little bit here. I mean, I'm not contradicting myself. I'm simply saying there's another facet of this, and that facet is, I mean, some people say, okay, is this statute a penal statute? And I think that that doesn't answer the question, but to the extent that the court wishes to sort of accommodate itself to a lot of case law, then the answer is it is remedial and not penal. So it doesn't make any difference. And so for purposes of both applying the Beaver Rule, in which you have to look at the nature of the conduct, and also applying Country Mutual versus Whitehead, the freedom of public contract, or are we going to do what the court here did, which was to abrogate an insurance policy by imposing public policy, that you have to look at the facts and circumstances of every case. And so, yes, the individual facts of the case and the individual structure of contracts or their statutes does matter. In a related vein, the appellate court also gave no service to the rules regarding the interpretation of insurance policies. At the time that these policies were sold, several Illinois courts had issued opinions holding that policies had the potential for coverage of TCPA claims. Standard received premiums for that coverage. The insurance industry had available common exclusions, which we referenced in the brief, which would apply to punitive damages and which would also apply to TCPA damages, neither of which were found in the policy. Mr. Reagan, when did you first raise the issue of the agent of punitive damage? I can't expressly – I can't answer that question, Your Honor. I simply don't know. I'm not – I don't – I really can't comment beyond saying that. This question, this imposition of public policy, was sort of a real sleeper of an issue, which arose in oral argument in the Fourth District. I mean, that's where it came. Did you cite to a case Swiderski? Yes. What proposition? The last point I was going to make – I had several others, but I will abandon those, at least for purposes of measuring my 20 minutes here. We cite Swiderski for this proposition. We do not say that Swiderski decided the issue before the court. We do say, however, that Swiderski decided that there is the potential for TCPA damages, for coverage for TCPA, in an advertising injury policy coverage. And that's what we have here. Wasn't that a duty-to-defend case rather than a duty-to-identify, as this case involves? It is, Your Honor, except completely. But Swiderski said there is the potential for coverage. And implicit within that is the thought, perhaps, that these damages aren't so bad that public policy should be applied to do away with them. We've offered the court the opportunity to decide whether the Beaver opinion should be followed. But even if the court does not decide to not follow Beaver, which would be the majority national rule, if the court does adhere to Beaver, then we suggest that this would be a good opportunity for the court to define the nature of conduct and the nature of damages which would give rise to the operation of the case. We would ask that the appellate court be reversed. If we should hold that the TCPA damages are not insurable, wouldn't that hold indisposable of the appeal? No other issues to be resolved by sending it back? If the court were to decide that, yes. Thank you. Did you have more to conclude before the question there? No. I'm mindful. Still got a little yellow time. I understand. But that will disappear quickly. Okay. Thank you. Thank you, Mr. Reagan. Good morning, Your Honors. May it please the Court. For the plaintiff's appellee, Standard Mutual Insurance Company, Robert Chemers, counsel. Mr. Reagan's argument was not the one. Mr. Chemers, even before you get going, I'm just thinking about it after Justice Freeman's question. If, indeed, we agree, the opposite is true as well. If we agree with the position taken by Mr. Reagan here, there are still issues to be resolved in the appellate court. Is that right? Or they can be resolved here, Your Honors, because you have the full record. The case is here on summary judgment. There were seven motions for summary judgment granted by the circuit court. The appellate court, for whatever reason, only went to the punitive damage penal nature of the statute issue and referred to the other arguments we raised as colorable and interesting at paragraph 28 of its opinion, whatever that means. But one of the issues that this court could clearly resolve, if it decides that the damages under the TCPA are covered by a policy of insurance, is the fact that the insured here and what is referred to by the plaintiff, by the defendant as pure argument, breached the policy of insurance. In a four-month period, the lawsuit is filed in June of 2009 by Locklear, class action, subsequently removed to the federal court. July 13, just a little over a month later, Standard Mutual issues a lengthy 11-page reservation of rights letter to the insured, disclosing the nature of the policy defenses and issues under the three policies at issue, which include a policy by Standard Mutual issued to a real estate agency for the business, a policy issued for an apartment building and vacant lots in Girard, Illinois, and a policy issued for a house that was leased out by Ted Lay in Nilewood, Illinois. These are the policies. They were discussed in the reservation of rights. A conflict was disclosed to the insured. They signed a waiver on July 22nd. So we're within a five-week period. In October of 2009, four months into the litigation, the attorney hired by Standard Mutual is fired by Norma Lay. Fired. He's replaced by personal counsel, who is shown on the reservation of rights letter, which is in the record at 1103 to 1116, that was Ed Reese. Shortly thereafter, one month later, two months later, the case is settled. The case is settled for $1,739,000 under an agreement, which they call it argument, Justice Thomas, you pointed out to the cases the Seventh Circuit discussed, the Creative Montessori case, the CE design case talking about a rather unusual business model for an engineering firm. They're also the plaintiff in 150 TCPA class actions. But according to Judge Posner, it's not illegal or unlawful to be a professional plaintiff. And the reliable money order case. It's a business model of the lawyers who handle these TCPA class actions. So look at this settlement and call it a settlement. It's kind of questionable. The insured fires the defense attorney. We have a breach of the cooperation clause. We have a voluntary payment undertaking. We have other issues with respect to that. We have a breach of the common law duty of good faith and fair dealing between the insurer and the insured. That having occurred, what happens next? They agree to a judgment, a judgment for $1,739,000, which will never, ever, ever be collected against the insured. The insured has no responsibility for the judgment. The judgment is solely collectible against the policies of insurance. So then there's a finding made by Judge Reagan, no relation, in the Federal District Court in East St. Louis approving this settlement. They rely on that approval as if it is somehow magical. Where the Seventh Circuit talked about it doesn't mean anything. It's not binding on any other court. It's not binding because the parties who colluded or concocted or agreed to a settlement that will never be paid by the insured come into court hand-in-hand, or arm-in-arm, I think is what they said in Creative Montessori. And they call that too weak a read to rely upon for that type of settlement. So that issue is before this court. The issue that this court addressed in 2006 in the Groen v. Potomac case is the flip side of this case. That case held that as a general rule, as a general rule, an insured requires the, it must obtain the consent of the insurance company to settle with a claimant. That's the general rule. The exception is the Gwilin case where the insurer disclaims coverage, abandons its insured, and then is not left in a position to point to any part of the policy that would protect its interest. In that case, this court approved what some lawyers call a rollover settlement or an agreed judgment where basically they decided the slip and fall down the stairs was worth $600,000, but the insured, because of the disclaimer, assigned all its rights to the tort plaintiff against the insurance company, and the tort plaintiff agreed will never collect a nickel from the insured solely against the insurance company. This court wrestled with the issue that's found in the policy. The policy talks about recovery of damages or sums that are imposed against the insured as damages because of bodily injury or property damage. Mr. Chemers, is that one of the issues that remained open below with the appellate court? That is one of the issues, and that's one of the issues this court can address because it clearly goes to the essence. Their whole position, as you heard the discussion that this is pure argument, well, it's more than that. That summary judgment was granted. The court below affirmed the judgment. It didn't say any of the motions for summary judgment were standard mutual, was granted, were denied, or were irrelevant. It regarded this of all the issues as dispositive, and this goes hand in hand. Well, let me ask you this. I put it this way with Mr. Reagan, that we have the legal issue as framed as to whether or not, at least under the appellate court's analysis, this is punitive and, therefore, insurance would kick in. If this court is bothered if these allegations or argument or whatever you want to call the collusive underpinnings here, that issue, if this court decides it, is a separate issue that this court can decide. You said the record's in front of us. Or if we disagree with your position on the whole punitive nature of these damages, at least a remand to the appellate court that they would be forced to address those issues. That would certainly be appropriate, Your Honor. Yes. All right. And then, again, following up with that, you heard my question to Mr. Reagan about the statute talking about treble damages. Right. The statute, 47 United States Code Section 227.2b or whatever it is, refers to the damages in two sections. The first section, the one before the treble section, the violation of the TCPA entitles a person to actual monetary damages or $500 per violation, whichever is greater. Okay. So that part of the statute, which is really what we're talking about, is both remedial, you get the recovery of actual monetary damages, which in the case of a fax, I mean, everyone in this room probably has walked to a fax machine and picked up a fax, and what that involved is perhaps a couple of pennies for the use of the paper, the ink, the toner, and the time. Those are the actual monetary damages. Or $500 per fax, whichever is greater. Well, $500 is certainly greater than the actual damages anyone could conceivably sustain with respect to the receipt of an unwanted fax. The statute then proceeds and says a knowing willful violation of the act will entitle the claimant or will impose treble damages against the sender. Mr. Chalmers, are you saying that that provision where it's remedial with the small amount of damages versus and penal at the same time? Yes. Because the statute says if there's a violation of the TCPA, a person is for that violation, the liability is the actual monetary damages suffered by the person, by the claimant, or $500 per violation, whichever is greater. Actual monetary damages would be something a person would prove as to what their loss was. And I mentioned that. The cost of the piece of paper, the ink, the toner, and the time it would take for someone to walk from a desk in an office or chambers to the clerk's office to get a fax off the fax machine, those would be the actual damages. That's remedial. Punitive damages or penal damages or damages that there are no relation whatsoever to the actual damage is $500 per fax. But is that logical? How can a statutory provision be both remedial and penal at the same time? Well, the nature of the damages that is permitted by that particular section is just that. It is remedial. And people don't sue for that. That's their whole argument. This can't be punitive. People don't sue for the pennies they lose by receipt of a fax. This is a class of 3,478 violations. And they're not suing for 3 or 4 cents each. They're suing for $500 each. They agreed 3,478 faxes times 500 bucks a fax is $1,739,000. That's what they agreed to. That is, those are damages which bear no relation whatsoever to compensation. And the appellate court did a good job in looking at that and discussing the dichotomy in Illinois between compensatory damages and punitive damages. And they said compensatory damages are awarded as compensation, indemnity, or restitution for a wrong or injury sustained by the claimant. They could have awarded compensatory damages. It would be about 3 cents, maybe a nickel. Maybe a nickel per person who received an unwanted advertisement for a car wash in Girard, Illinois. That's what this case is about. Or they get 500 bucks per fax, which we submit to the court is penal in nature. It's penal because of the nature of the damages and because of what the TCPA says. The Gambino case, which Mr. Reagan mentioned, we cited it as well, says punitive damages are to act as retribution. They are to deter a defendant from similar conduct in the future and to deter others from similar conduct as well. Well, the TCPA dovetails with that concept from Gambino because the very purpose of the TCPA is to deter future sending of unwanted facsimile advertisements. Mr. Chambers? Yes. Excuse me. I want to go back to something you said because I want to understand the posture of this case and if we're dealing with what might be referred to as the law of the case. You said the agreement was approved by Judge Reagan, not related, in federal district court, if I heard you correctly. Correct. Were there any objections? I mean, was Standard even aware of that taking place? No. Mr. Chief Justice, there were no objections. Standard Mutual was not there. This was a done deal. They come into court, join together. Okay. Well, you answered the question. You weren't aware of it. No. And there were no objections. No. Now, earlier when Justice Thomas asked you to kind of revisit the point that he had asked Mr. Reagan about the nature of this kind of agreement, you had turned and said, referring to Mr. Reagan, that, well, the argument is that it's just an argument. Your position is just an argument. And then you went on to discuss that there are cases out there, Seventh Circuit and so forth. My question is, factually, what is your response to the argument that it's just an argument? I'm trying to understand, drill down on that. Where are we? We did not raise in this case the conduct of class counsel as it was in the various Seventh Circuit cases. We didn't know what their conduct was. We were presented with a settlement. And then you read the settlement. The settlement agreement is in this record. That's not a settlement. It's not a settlement for an insured to fire its lawyer and then roll over and say, okay, enter a judgment against me. I consent to the judgment. I will give you my employees and their testimony, my books and my records, and I will assist in every way I can so that you can collect that judgment against the insurance company. This is not unusual to this case. We pointed to the other cases because the Seventh Circuit went on and on and on about numerous cases that these lawyers were involved in, not Mr. Reagan, but the Anderson and Wonsall law firm. And it's documented. They say, well, don't read Creative Montessori. Creative Montessori was remanded and it got all cleared up. Well, that's fine. But what about the reliable money order case? What about the CE design case? This is public record, public knowledge, and it's a manner or method of doing business. They get these cases, and typically this case, Your Honors, is not the typical case. This is not Pekin Insurance versus Exadata, which is cited. That's a case where there was a disclaimer, and the appellate court was quick to say to the insurance company, represented by me, you can't complain about what happened here. You disclaimed coverage. Well, we can complain about what happened here because my client, Standard Mutual, did not disclaim coverage. It was defending. Notwithstanding the fact they were defending, the same scenario happened as happened in the other cases that the Chief Justice mentioned. Well, if there is a duty to defend a TCPA claim, which we have so held, doesn't that necessarily mean that there is potentially a situation where there's also a duty to indemnify? And thus, the appellate court's decision does conflict with Swiderski, doesn't it? No. The appellate court's decision was solely, in the nature of the way they decided this on the single issue of the damages under the TCPA, was there was no duty to indemnify. They didn't talk about the duty to defense. Swiderski was a duty to defend case which didn't concern itself with whether the damages under the TCPA were penal in nature. What this court decided was nothing more than the TCPA claim, rightly or wrongly. What difference does it make that this is conduct of an agent? Well, from our perspective, Justice Garmon, it makes no difference because there's no agent. The exception to the punitive damage rule, they say, okay, if the TCPA damages are penal and the appellate court got it right that way, then there was nothing done by Ted Lay or Norma Lay because they hired business-to-business. Business-to-business lied and said, we have people we can send these faxes to who have given permission for their receipts. That having been said, the faxes, you know, were sent from Bucharest, Romania, and C-543 in the record is the fax, and it shows right on there, sent from Bucharest, Romania. There is no agent. The exception to Beaver or the ability to allow punitive damages for the conduct of an employee has always been, in every case in Illinois, an employer-employee relationship, not an agent. There's nothing in this record to suggest that business-to-business was the agent of Lay. And even if it was, it makes no difference. Lay can't hide behind what B-2B did. Because under the TCPA, the sender, Lay, is the one who is liable. And it doesn't matter, there's no vicarious liability under the TCPA. Ted Lay, Norma Lay, the Lay real estate agency, hiring someone to send faxes is still the sender. Their liability is not vicarious. Their liability under the Act is direct, is direct, is automatic. All they have to do is prove a fax was sent. They don't have to prove the fax was received, and is subject to $500 per fax without regard, without regard to damage, which is why the appellate court said it's penal. Without regard to the loss, the statutory fixed amount, there's no relation to loss. You mentioned about the Lays. Isn't that a corporation? Wasn't Pekin decided based on whether a natural person or a corporation can sue in the first instance? Yes. The Swiderski case involved Ernie Rizzo doing business as whatever the name of his business was. And this court held that he had a claim that fell within the advertising injury provision of a general liability policy. We argued in the Pekin case, as we argue here, that that provision, that policy language talks about person, whereas other sections of that same provision of advertising injury talk about person or organization, such as a corporation would be an organization. The TCPA talks about residential privacy. Corporations don't live in houses. Justice Burke, the argument we've made is a corporation has no right to privacy. The essence of the TCPA is privacy right. A corporation, as the Seventh Circuit said, they don't like the American States case. This court didn't like the American States case in Swiderski. It said a corporation has no place to hide. It has no privacy right. That is one of the issues that Justice Thomas mentioned that could arguably be decided on remand if that's where this case is headed. We would submit to this court, however, that in the nature of the damages under the TCPA, the appellate court got it right. And we'd ask this court to affirm. Thank you. Questions? Sort of in the lightning round here, in response to your question, Justice Thomas, which is kind of inferentially picked up by Justice Burke about the availability of the treble damages, we cite page 11 of our reply brief, page 13 of our main brief. We cite universal underwriters to that effect. And universal underwriters, a federal court of appeals case, said that also the fact that Congress elected to make treble damages available separate from fixed damages strongly suggests that the fixed damages serve additional goals other than deterrence and punishment. And in the preceding sentence talked about the $500 as being remedial and the treble as being punitive. And at page 11 of the reply brief, we talk about that and then cite the court to a Wisconsin case dealing with insurability of multiple damages in a dog bite statute. But the Wisconsin Supreme Court drawing the distinction between multiple damages and otherwise. Mr. Chemer's argument here, and not him personally, but rather his client, I mean, the argument is off the tracks. I mean, he's here wanting to talk with you about issues undecided, not decided by the appellate court, and talking with you about cases that aren't cases, not even issues, but cases that aren't before you. He doesn't talk about the issues that are here. And so he talks about, in Gambino, about the purpose of punitive damages, but he doesn't say a word about the real holding of Gambino, which is when can punitive damages be awarded. And they can only be awarded for egregious conduct and not what we have here. On the vicarious liability question which was raised, and that was something that I did not reach in my main presentation here, is absolutely we do rely upon the fact that the sort of the central body of Illinois law in this is that if an insured is vicariously liable for the acts of an employee or an agent, and those words appear in these cases, then that's something that you can insure against. So there's lots of bad conduct, if you will, for which people buy and legitimately can buy insurance. And to say that this liability here is not vicarious just doesn't meet with reality. The reality is that Mr. Lay, running his real estate business, hired somebody who came to him and said, look, I've got a legitimate way for you to conduct your business here, and we're going to do it legally. And it turns out they lied and they didn't do it. And the only reason we have any liability is a regulation which says that, well, you know, if somebody does it on your behalf, you're a sender. That's no different than a corporate agent or employee who's out doing your work. You never authorize them to do it in an improper, let alone willful and wanton, egregious manner. And yet he does, and you're entitled to buy insurance for that. The question of can we settle has been decided. The MIOTA and MYODA and the Con Ed cases talk about the fact that the insured has the right to settle in these circumstances. The question as to whether Standard Mutual knew of the hearing, knew of the circumstances, of course they did. And that's in the record as well. Their assigned counsel, and, of course, in Illinois you have what is referred to as the tripartite relationship. The assigned counsel has two clients, if you will. He has the insured, but he also has the carrier as a client. He had been discharged, and we're not being critical of him at all, but he had been relieved formally, which the insured has the right to do. That's the whole nature of Maryland Casualty v. Peppers. You should get to pick your own attorney. And so in the course of this he had been relieved of his duties, and yet he continued to participate in the case, and yet he was at the fairness hearing, and as we have shown in the statement of facts, he spoke up. And he said, well, wearing our other hat, now the English language is not exactly precise here, but wearing our other hat we might have the right to get contribution, et cetera. And the other hat, of course, was Standard Mutual. So for Mr. Chemers to flat out tell you Standard Mutual didn't know does not comport with the record. Again, I go back to the fact that whereas his argument was impassioned, it did not talk really about the decision made by the appellate court. So thank you very much. Thank you. Thank you. Case number 114617, Standard Mutual v. Lay, is taken under advisement agenda number 11. Thank you.